## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| BMO Harris Bank N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-CV-00740 |
| | ) | |
| KMH SYSTEMS, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## RECEIVER'S INITIAL REPORT

Sandor Jacobson, not individually, but solely as the duly appointed Receiver (presently on an interim basis, the "**Receiver**") with respect to the above-captioned case designated *BMO Harris Bank N.A.* ("**BMO**") *v. KMH Systems, Inc.* ("**KMH**" or the "**Company**") pursuant to that certain *Order Appointing Interim Receiver* entered by this Court on March 3, 2020 (the "**Interim Order**") [Docket No. 17] hereby submits the *Receiver's Initial Report* (the "**Initial Report**") for the period of March 3, 2020, through May 31, 2020 (the "**Period**"), as follows:

### I.    EXECUTIVE SUMMARY

1.    This Initial Report is filed pursuant to the Interim Order and several *General Orders* issued by the District Court (the "**General Orders**"). Originally due twenty-one (21) days after the Receiver's appointment, the filing deadline has been continued to June 9, 2020, by the General Orders, allowing the Receiver more time to uncover assets, liabilities, transfers, and the general business operations of KMH during the time between his appointment and the filing hereof, all of which are addressed herein.

2.    Since his appointment, the Receiver has continued to conduct due diligence to ascertain the assets and liabilities of the Company. Described below in summary fashion are the

Receiver's efforts to identify the operations of KMH, its debt structure, certain transfers of assets which may give rise to causes of action in favor of the Receiver, KMH's ownership interest in machinery and equipment, active and non-active litigation involving the Company, and the Receiver's continuing due diligence and proposed next steps.

3.      Further, the Receiver has concluded that the Company is insolvent and cannot pay its debts as they become due. The Receiver therefore believes that a wind-down of the Company and liquidation of all known assets is in the best interest of the Company and its creditors. KMH has agreed to cooperate with the Receiver and assist as needed with the liquidation.

II.      **SUMMARY OF BUSINESS OF KMH SYSTEMS, INC.**

4.      KMH was incorporated under the laws of Ohio in 1975. It was formerly known as Kettering Material Handling, Inc. but changed its name to KMH Services, Inc. in 1997. Michael Guenin is currently the sole shareholder of KMH Systems, Inc. after acquiring the business from his father, John Guenin. As of the date the Receiver was appointed, the Company operated from locations in Ohio, Kentucky, Indiana, Illinois, Michigan, Georgia, and Tennessee. Some of these locations are leased from entities which are affiliates of the Company.

5.      Under its original business model, the Company engaged in the business of buying, selling, installing, leasing, servicing, and repairing commercial grade forklifts and other material handling  equipment used for similar purposes in various industries. As explained in more detail below, however, the Company spun-off and divested several of its divisions to affiliated entities in 2018 (defined below as the Spinoffs), leaving the Company with a greatly reduced scope of services.

6.      The Company and its affiliated entities (i.e., the Spinoffs) perform services from shared locations under the same roof, thus appearing to maintain an integrated approach to doing

business despite the transfer of assets from the Company to the Spinoffs, which has led to significant confusion among customers and creditors of the Company. This confusion, as well as the financing of the Spinoffs, has led to material effort on the part of the Receiver to ascertain the scope of the Company's operations; the impact to the Company's balance sheet, the rationale for the Spinoffs in the first place; and the impact of the Spinoffs on creditors.

### III. RECEIVER'S INITIAL ACTIONS: DOCUMENT REQUESTS AND MEETINGS

7.      Immediately upon his appointment on March 3, 2020, the Receiver undertook several actions to understand the Company's business and determine a strategy to faithfully discharge his duties and responsibilities. The Receiver's first action was to transmit a request for documents via email to Michael Guenin ("**Guenin**"), President of KMH, and Tom Godfrey ("**Godfrey**"), counsel for KMH, which included the usual and customary requests for a 13 week cash flow budget; bank account statements and a list of all bank accounts; proof of insurance (with the Receiver to be added as an additional named insured); a list of accounts receivable with support; a list of machinery and equipment inventory with details; a list of recently closed transactions; a description of open purchase orders; copies of leases and contracts; a list of accounts payable; employee information; and other related matters.

8.      Upon receipt of the Receiver's initial document request, the Receiver was informed by Messrs. Guenin and Godfrey that the best person to produce the requested information would be Mr. Brian Ritchey, who the Receiver learned from Messrs. Guenin and Godfrey is the principal of Precision Accounting & Consulting Services, Inc., an outsourced bookkeeper for KMH ("**Ritchey**", and together with Guenin and Godfrey, the "**Management Team**"). The Receiver since learned that Mr. Ritchey is a fifty percent (50%) owner and operator of Fleet Parts and Maintenance, LLC f/k/a KMH Parts and Services, LLC, a Delaware limited liability company

("**KMH Parts and Services**"). KMH Parts and Services is one of the divisions which was spun off and divested by KMH, as addressed in section V hereof.

9.      In response to the Receiver's requests for documents and a request to meet with Mr. Ritchie, the Receiver was contacted by counsel for Mr. Ritchey, who helped schedule an initial meeting just two days after the Receiver's appointment among  Mr. Ritchey, the Receiver, and one of the Receiver's colleagues at Plante Moran. Thereafter, the Receiver augmented and prioritized his requests for Mr. Ritchey.

10.      Also as part of the Receiver's initial actions, the Receiver retained Maynards Industries USA Appraisals, LLC ("**Maynards**") to perform an on-site appraisal of machinery and equipment inventory ("**M&E**") for three of KMH's operating locations. In order to facilitate Maynards review of the M&E, the Receiver requested of the Management Team a complete and accurate list of all equipment by location, which the Company could not produce instantaneously and has required greater than expected effort and delay. The Receiver opted to conduct an on-site appraisal of KMH's equipment for the Dayton, Ohio; South Bend, Indiana; and Murfreesboro, Tennessee locations given that the Management Team produced indicia that most of the Company's M&E is located among these three sites.

11.      As a final step of the Receiver's initial due diligence in the first week of his appointment, the Receiver arranged a meeting among himself, one of his colleagues at Plante Moran, his counsel, and Messrs. Guenin and Godfrey. During this meeting, the Receiver informed Messrs. Guenin and Godfrey that he believed the Company was experiencing severe financial distress and apparent mismanagement. The Receiver based his determination upon, among other things: (a) the Company's inability to fund payroll; (b) the Company's unpaid 401(k) employee withholdings and employer match funds to the Company's employee retirement plan and resulting

claims of its employees and its attendant dealings with the U.S. Department of Labor; (c) the Company's obligations to state and local taxing authorities for sales, use, and personal property taxes; (d) the voluminous number of lawsuits filed and judgments entered against the Company; (e) the Company's inability to procure basic general liability insurance; and (f) the perception that Company was unable, and would be unable in the future, to provide timely and complete information about the Company's assets, liabilities, and transfers.

12.     Based upon the Receiver's determination, it was concluded by the Receiver and agreed upon by the Management Team that the Company could not sustain its operations, and further, that the Management Team would cooperate with the Receiver in terminating the Company's operations and winding down its financial affairs. The Receiver therefore focused his continued due diligence to further a liquidation of the Company.

## IV.    NON-BMO BANK ACCOUNTS

13.     The Receiver learned that the Company opened bank accounts at Huntington Bank and Regions Bank, in addition to its account at BMO. As explained to the Receiver by the Management Team, the non-BMO accounts were opened and used by the Company as the primary operating accounts because the account at BMO was subject to setoff and several judgment creditors have been attaching their judgments to the BMO account. The Huntington account has been closed and the Regions account is in the process of being closed. The Receiver has opened a Receivership account at BMO which is where he is depositing and disbursing funds.

## V.    CONTINUING DUE DILIGENCE: DEBT STRUCTURE AND SPINOFFS

14.     During his separate meetings with Mr. Ritchey and Messrs. Guenin and Godfrey, the Receiver and his counsel identified several areas requiring deeper investigation and due diligence in order to identify existing assets, as well as potential assets, of the receivership estate.

Although the Receiver is still awaiting exhaustive supporting documentation and verification to complete his investigation and analysis, the Receiver believes the he has preliminarily identified the history of the Company's debt structure and various transactions giving rise to potential causes of action in favor of the receivership estate.

15.     In or around 2005, KMH and Fifth Third Bank ("**Fifth Third**") entered into a credit facility in the approximate aggregate amount of $16 million. Fifth Third recorded a UCC-1 financing statement with the Ohio Secretary of State as Document No. 97627445, as amended or continued from time to time, securing its loan with a blanket lien in all assets of the Company. In 2017, the Company experienced financial distress and Fifth Third apparently became uncomfortable with its lending relationship to the Company. The Company was forced to locate a replacement lender to refinance the Fifth Third debt.

16.     BMO was originally interested in refinancing the Fifth Third debt, in total, on a secured basis and would have been granted first priority liens on essentially all assets of the Company. It appears to the Receiver, however, that BMO ultimately determined not to pursue a complete refinance of the Fifth Third debt and instead opted to proceed to refinance only a portion of the Fifth Third debt. The Company and BMO therefore closed on a $7,000,000 line of credit facility on October 18, 2017 (the "**BMO Secured Loan**")[1]. As part of the BMO Secured Loan, BMO and Fifth Third entered into an Intercreditor Agreement dated October 5, 2017. Pursuant this intercreditor agreement, the BMO Secured Loan would effectively be secured by: (a) first priority liens and security interests in and to accounts receivable of the Company, and (b) a blanket lien and security interest in all other assets of Company, junior to the lien of Fifth Third on all

---

[1] The BMO loan documents were filed with BMO's complaint, and a lien search for UCC filings with the Ohio Secretary of State reveals a UCC-1 financing statement on all assets of KMH in favor of BMO, designated as filing number 238082472.

assets of the Company other than accounts receivable. Mr. Guenin also executed an unlimited personal guaranty of the BMO Secured Loan.

17.     BMO's decision to refinance only a portion of the Fifth Third debt resulted in additional pressure on the Company to refinance the balance of the Fifth Third loan. KMH was ultimately able to repay Fifth Third by obtaining two additional loans, but only by divesting itself of a substantial amount of property which was subject to the junior liens and security interests of BMO, apparently without the consent of BMO.

18.     In addition to financing from BMO and Fifth Third, the Company typically obtained M&E inventory on credit through purchase money security interest liens ("**PMSI Creditors**"). The Receiver has caused to be completed a current UCC lien search with the Secretary of State of Ohio and identified over thirty (30) different creditors, some of which are PMSI creditors. The Receiver has been attempting to reconcile whether the M&E which is specific to PMSI Creditors is still in the possession of the Company.

19.     As part of his continuing due diligence, the Receiver was provided with a Business Structure corporate organizational chart prepared by KMH's counsel dated December 31, 2015 (the "**Dec. 31, 2015 Org. Chart**"). In the Dec. 31, 2015 Org. Chart, KMH is depicted as being comprised of four different divisions (collectively, the "**KMH Divisions**"): (1) New & Used Department; (2) Integrated Systems Department; (3) Parts & Service Department; and (4) Rental Department.  The Dec. 31, 2015 Org. Chart also depicts an enterprise adjacent to KMH and the KMH Divisions called Midnight Ryder Transportation, LLC, which is depicted as being owned by "Family Trust" and described as a "Transportation Company" which "owns Trucks & Vans, Trailers, etc."

20.     During the course of meetings and discussions among the Receiver, his counsel, and/or  the Management Team, it was voluntarily disclosed to the Receiver through oral communication and documentation that the business operations for three of the four KMH Divisions, and significant assets attendant thereto, were transferred to newly created entities, such that KMH effectuated a spinoff of its primary business operations in 2018 (the "**Spinoffs**"). The Receiver immediately determined that assets which should have been in the Receiver's estate were divested by KMH as a result of the Spinoffs, and thus, began a more robust investigation into the magnitude of the these matters, including the issuance of numerous subpoenas.

21.     To date, the Receiver has learned that the Spinoffs were purportedly made to facilitate refinancing of the remaining Fifth Third debt after consummation of the BMO Secured Loan. In summary, it appears to the Receiver that with respect to the Parts & Service Department and the Rental Department, the Spinoffs were performed essentially as follows: First, new entities called KMH Parts & Services, LLC (previously defined herein as "KMH Parts & Services") and KMH Rental, LLC ("**KMH Rental**") were each organized under the Delaware Limited Liability Company Act in or around late December 2017.[2] Second, significant assets were transferred by the Company to KMH Parts & Services and to KMH Rental (the "**Transferred Assets**"). The Receiver has located "invoices" from KMH to KMH Parts & Services dated April 30, 2018 in the amount of $1.4 million, and from KMH to KMH Rental dated  October 19, 2018 in the amount of $5,776,310. It appears that in each case, these invoices purport to be the paperwork under which the Transferred Assets were conveyed to KMH Parts & Services and to KMH Rental. Third, KMH Parts & Services and KMH Rental entered into a loan transaction with Key Bank in April 2018

---

[2] The Receiver has since learned that KMH Parts and Services changed its name to Fleet Parts and Maintenance, LLC, and that KMH Rental, LLC has changed its name to Certified Lift Solutions, LLC.

and with First Merchants Bank in November 2018, respectively. Those loan proceeds were used to pay off Fifth Third, and the Transferred Assets now serve as collateral for each of these loans. At this time, the Receiver has not received or located any indicia that BMO consented to the conveyance of the Transferred Assets free and clear of its liens and security interests (which were junior to Fifth Third but were valid and perfected liens and security interests nonetheless).

22.     The Receiver is still conducting his analysis of the exact circumstances under which the Transferred Assets were conveyed to KMH Parts & Services and to KMH Rental vis-à-vis when the loans to these two Spinoff entities were made. The Receiver is also still investigating whether he has a bona fide cause of action for fraudulent transfer of the Transferred Assets, including whether the loans from Key Bank and First Merchants Bank would have viable defenses thereto. Furthermore, at this time, it does not appear to the Receiver that BMO authorized the conveyance of the Transferred Assets which served as collateral for the BMO Secured Loan, even though the transactions described above did reduce the senior indebtedness.  BMO may therefore have a direct cause of action to assert that its liens and security interests still remain in and to the Transferred Assets, to the extent the Transferred Assets remain property of KMH Parts & Services and to KMH Rental, subject to any defenses of the Spinoff entities, Key Bank and First Merchants, respectively.

23.     Notwithstanding the loans to the two Spinoffs described above, it appears to the Receiver that KMH Parts & Services, and KMH Rental continued to operate as if they still comprised the KMH Divisions. This conclusion is predicated upon the fact that the Company, KMH Parts & Services, and KMH Rental all operate from shared, integrated facilities; perform shared services among them; and use KMH as the issuer of invoices for all services performed by

KMH Parts & Services and by KMH Rental. The Receiver's investigation into whether these consolidated operations can be monetized is still ongoing.

24.     In addition to the foregoing, the Company created a spinoff for its Integrated Systems Department. Unlike the Spinoffs for KMH Parts & Services and to KMH Rental, the Spinoff for Integrated Systems Department was created pursuant to a Purchase and Sale Agreement (the "**Integrated PSA**"). In general, the Integrated PSA provides for the transfer of the operations located in Columbus, Ohio to a company to be established by Mr. Tim Neroni, the former President of KMH's Columbus, Ohio division, in partial resolution of a dispute of a salary / earnings conflict between Mr. Neroni and KMH. The Receiver is continuing his investigation into this transaction.

25.     In sum, the three Spinoffs addressed above are summarized in the following table:

| Division | New Entity | Date Formed | Subsequent New Entity | New Entity Owners |
|---|---|---|---|---|
| Parts & Service | KMH Parts & Services, LLC | 12/31/2017 | Fleet Parts & Maintenance, LLC | 50% Nicole Guenin, wife of Michael Guenin, and 50% Brian Ritchey |
| Rental | KMH Rental Equipment, LLC | 11/21/2017 | Certified Lift Solutions, LLC | 100% Nicole Guenin, wife of Michael Guenin |
| Integrated Systems | Top Shelf Integrated Solutions, LLC | 12/12/2017 | NONE | Timothy Neroni, former President of KMH Systems |

26.     The Receiver has learned of additional Spinoffs, as well as subsidiaries, or other affiliated entities which the Receiver is further investigating. Specifically, it appears that in 2015, KMH divested its transportation division to a company called Midnight Ryder, LLC, an entity

which owns vans and transportation equipment. Tuff Equipment, LLC is another entity disclosed by the Management Team which the Receiver is still evaluating.

27.     In light of the complicated and interwoven transactions between KMH and affiliates, the Receiver has been required to obtain information from third parties to corroborate the limited documentation provided by the Company. Accordingly, the Receiver issued nineteen (19) subpoenas for documents, most of which relate to the Spinoffs (the "**Subpoenas**"). Given the number of entities in which KMH is affiliated, the Rider to the Subpoena has been thorough and comprehensive by necessity. The Receiver and his counsel continue to work through any production issues raised by recipients of the Subpoenas.

## VI.     <u>DEMAND LETTERS</u>

28.     As part of his duties, the Receiver immediately sought to collect all outstanding accounts receivable represented by ownership as being due and owing to the Company. At the time of the appointment of the Receiver, the Company's books and records reflected gross accounts receivable in the approximate amount of $14.4 million owed to the Company from approximately 150 account debtors. Accordingly, the Receiver instructed his counsel to prepare a generic demand letter to the account debtors of the Company. The Receiver then caused specific account statements to be included with this correspondence (collectively, the "**Demand Letters**").

29.     The Receiver has been disappointed by the responses he has received from recipients of a Demand Letter. The Receiver has extensive experience in monetizing accounts receivable for distressed companies over the course of his 17-year career, but never before has the Receiver encountered an inability to collect on receivables in the magnitude such as here. It has become apparent to the Receiver that the accounts receivable in the Company's books and records

do not accurately reflect what the Company was owed by its customers, and that the Company's A/R ledger is materially inaccurate.

30.     Virtually every response to the Demand Letters has been to contest the amount demanded in a significant amount; to assert that it is the Company which owes recipients of the Demand Letters money; to inform the Receiver that the account was paid; in some cases, to state that they never heard of the Company; and to otherwise assert that the Demand Letter is unfounded. As of the filing hereof, the Receiver has seen enough responses to have a general sense that the accounts receivable are not worth their face value, or any meaningful fraction thereof, and there may be some accounting irregularities. The Receiver has made BMO, the secured creditor whose collateral extends to accounts receivable, aware of these major discrepancies, and he continues his investigation into these matters.

## VII.     MOBILE SOLAR GENERATOR LEASE

31.     The Receiver has learned that the Company, as lessee, entered into a solar generator lease (the "**Lease**") with Solar Eclipse Fund IX, LLC (the "**Lessor**") on July 10, 2014. The Receiver investigated the facts surrounding the Lease and learned that the Lessor entered into a Solar Equipment Purchase Agreement on July 10, 2014 with DC Solar Solutions, Inc. ("**DC Solar**") under which the Lessor purchased 619 mobile solar generators ("**MSG's**") from DC Solar on terms and conditions set forth in the purchase agreement. The Company leased 300 of the Solar Eclipse MSG's, model SCT-25-H, for a ten-year period expiring on July 9, 2024 in accordance with the terms of the Lease. The Lessor provided a notice of default to Company on March 29, 2018, due to non-payment of the required monthly rent of $900 per MSG under the Lease, or $270,000. The Company failed to sublease the majority of MSG's and therefore was unable to make all required monthly payments to the Lessor. The  Lessor commenced a non-payment action

(*Solar Eclipse Fund IX, LLC v. KMH Systems, Inc.*, Case No. 2018-CV-03609) against the Company in Ohio. On December 9, 2019, the Common Pleas Court of Montgomery County, OH issued a judgment against the Company in the amount of $4,420,000 plus prejudgment interest of $310,611.10 for unpaid rent due to the Lessor during the period of March 2017 through June 2018, for a total amount of $4,730,611.10.

32.     The Receiver subsequently learned that DC Solar and several related entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 3, 2019 in the United States Bankruptcy Court for the District of Nevada. Prior to the bankruptcy, DC Solar was being investigated by the FBI for potential investment and tax fraud. In December 2018, law enforcement agents executed search warrants at DC Solar headquarters and elsewhere based on suspicion of running a fraud / Ponzi scheme. The FBI ultimately determined that the owners of DC Solar, Jeff and Paulette Carpoff perpetuated a $2.5 billion Ponzi scheme causing $1 billion in loss. Both of the accused have pled guilty to conspiracy to commit an offense against the United States and money laundering.

33.     The Lessor has been granted relief from the automatic stay in the DC Solar bankruptcy case to permit the Lessor to immediately take possession of the MSG's wherever they may be located and to re-lease the MSG's or put them to other use.  The Receiver has been in contact with the Chapter 7 Trustee and her agents to aid in the recovery of any MSG's that are owned by the Lessor and are currently in the Company's possession. In late March, the Chapter 7 Trustee informed the Receiver that a former employee of the Company notified her via email that the Company might be storing dozens of MSG's on vacant land in Indiana. The Receiver was able to locate approximately 110 MSG's on property that appears to be owned by an affiliate of the Company. The Receiver informed the Trustee that he located the MSG's and suggested that the

MSG's be identified by serial number and then sold or auctioned with the proceeds of the sales being shared in a negotiated amount. The Receiver has not been able to reach an agreement with the Trustee and assumes that the MSG's are still on the land in Indiana.

34. Additionally, the majority of the MSG's were assembled by Forest River, Inc. located in Elkhart, Indiana. The Receiver has been informed by Guenin that the Company purchased MSG's as inventory in addition to leasing 300 MSG's from Solar Eclipse Fund IX, LLC. The Company has represented to the Receiver that it currently is in possession of 25 MSG's. There are additional MSG's that are located on several of the Company's leased locations. The Receiver is in the process of obtaining Certificates of Origin from Forest River which are similar to a vehicle title, so that each MSG can be properly traced back to the rightful owners. The Receiver is attempting to ensure that MSG's that are owned by third parties are not sold by the Receiver without consent from the owner.

## VIII. CREDITOR LETTER

35. On May 7, 2020, the Receiver sent a letter to all known creditors of KMH (in excess of 800), as provided to the Receiver by KMH, advising creditors of the status of the Receiver's due diligence to date and providing a claim form for all creditors to complete and return to the Receiver (the "**Creditor Letter**"). A true and correct copy of the Creditor Letter is attached hereto as Exhibit A and made a part hereof. As provided in the Creditor Letter, the Receiver set a bar date of July 31, 2020 to return the claim forms but also forewarned creditors that it appears highly unlikely a distribution to unsecured creditors will be made in this case.

## IX. ASSET & LIABILITY SUMMARY

36. As provided in the Creditor Letter, the following depicts a preliminary description of the Company's assets and liabilities which the Receiver has identified or is in the process of

identifying. Most of these line items are qualified by the footnotes associated therewith, as contained in the Creditor Letter, as the Receiver lacks complete confidence in the Company's books and records.

<u>Assets[3]</u>

| | |
|---|---|
| Cash | $ -33,536 |
| Accounts Receivable | 14,110,281[4] |
| Due From Affiliates | 3,185,155[5] |
| Inventory | 2,431,597[6] |
| Machinery & Equipment (net of accumulated depreciation) | 5,479,763[7] |
| Other | 2,727,624[8] |

**Total Assets**      <u>28,123,540</u>

<u>Liabilities</u>

| | |
|---|---|
| Secured Bank Loans | $9,653,563[9] |
| Accounts Payable | 9,076,180 |
| Accrued Expenses | <u>1,194,7</u> |

**Total Liabilities**      <u>19,924,505</u>

37. As stated above, a final analysis of all assets and liabilities of KMH has not been completed, and no definitive conclusion thereof has yet been reached.

---

[3] The Company's assets are subject to a first priority blanket lien and security interests in favor of the Company's secured lender, BMO.

[4] The Receiver sent demand letters and account statements to all account debtors per the Company's 3/25/2020 accounts receivable report. The vast majority of these account debtors have disputed owing any money to the Company and in many cases have claimed to be creditors of the Company. The book value of this asset is considered to be significantly overstated by the Receiver, and collectability is uncertain, at best.

[5] The Receiver is in the process of investigating these claims and will pursue affiliated obligors, if appropriate.

[6] The Receiver has confirmed from his investigation that the new and used inventory appears to be significantly overstated. The Receiver is in the process of locating and identifying all of the new and used inventory for sale.

[7] The estimated recovery on the furniture, fixtures, machinery and equipment is unknown. The Receiver will liquidate these assets through the most expedient means available in order to maximize the recovery to the estate. The Receiver has been unsuccessful in locating assets in this category to support the net book value thereof.

[8] The Receiver is in the process of investigating other Company assets and will pursue applicable parties, if warranted.

[9] The Company is in default of its obligations pursuant to the terms of the loan documents with the senior secured creditor. The loans are secured with a first priority, blanket security interest in all of the Company's assets. This amount excludes penalties, accrued interest, and fees. The Receiver is continuing its investigation into all liens on Company assets.

## X.    RECEIVERS PROPOSED NEXT STEPS – ANTICIPATED SALE OF M&E

38.    The Receiver anticipates that his next steps will be to liquidate the M&E through a court approved sale, which may be conducted concurrently with a UCC Article 9 foreclosure by BMO as an additional means of providing notice. That decision has yet to be made. As stated above, and as set forth in greater detail in a motion to be filed by the Receiver seeking authority to sell the M&E, the most challenging aspect of the sale will be to ensure that the Receiver does not inadvertently sell assets for which he has no legal right to sell. This carve-out would include assets which are leased by KMH, as well as any M&E which is subject to the lien of a PMSI Creditor and for which such creditor objects to the sale of its collateral (unless it is to be paid in full from the proceeds specific to such asset).

## XI.    SUMMARY OF RECEIPTS & DISBURSEMENTS

39.    The Receiver opened a bank account at BMO and has prepared a schedule of cash receipts and disbursements that have occurred during the Period, as set forth in Exhibit B attached hereto and made a part hereof. The Company had no cash on hand when the Receiver was appointed. Therefore, the Receiver was forced to request that BMO advance funds into the Receiver account. BMO has advanced $155,442 into the Receiver account during the period and the Receiver anticipates requesting additional advances from BMO.

## XII.    CONCLUSION

40.    Given the foregoing, the Receiver submits that this matter is unique and unconventional, mandating considerable time and effort. At the same time, the Receiver is mindful of the law of diminishing marginal returns and that at the end of the day, the Receiver's efforts are highly unlikely to yield a distribution to unsecured creditors in light of the debt owed by KMH to its secured creditors. Further, due to the limited amount and value of the Company's assets, it

appears as if the liquidation will not generate a significant repayment of the BMO secured debt.

The Receiver is governing himself accordingly.


Dated: June 9, 2020                     By: /s/ Sandor Mark Jacobson
                                        Sandor Mark Jacobson, CPA

**This Receiver's Report Prepared by:**

SANDOR MARK JACOBSON, CPA
PLANTE & MORAN, PLLC
10 South Riverside Plaza, Suite 750
Chicago, IL 60606
Telephone: (312) 928-5387

--and--

ADAM P. SILVERMAN, ESQ. (ARDC #6256676)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd., Suite 1050
Chicago, Illinois 60604
Tel (312) 435-1050
**Counsel for the Receiver**

**Exhibit A to
Receiver's Initial Report**

Creditor Letter

# plante moran

**plante & moran, PLLC**
10 South Riverside Plaza
9th Floor
Chicago, IL 60606
Tel: 312.207.1040
Fax: 312.207.1066
plantemoran.com

**May 7, 2020**
**To All Known Creditors of**
**KMH Systems, Inc.**
**Illinois, Indiana, Ohio, Michigan, Tennessee, Kentucky, Georgia**

RE:     Notice of Receivership

Dear Sir or Madam:

Please be advised that on March 3, 2020 the Honorable Judge Charles P. Kocoras of the United States District Court for the Northern District of Illinois entered an order (the "**Order**") in the matter of *BMO Harris Bank N.A. v. KMH Systems, Inc.*, Case No. 20-cv-740 (the "**Litigation**") appointing, on an interim basis, Sandor Mark Jacobson as Receiver (the "**Receiver**") of KMH Systems, Inc. (the "**Company**"). It is anticipated the Order will appoint the Receiver on a final basis once the Court resumes normal operating procedures, or sooner. A copy of the Order is available on the Court's electronic filing system, https://www.ilnd.uscourts.gov/, or will be emailed to you at no charge upon your written request to the Receiver or his counsel.

The Order vests the Receiver with full power and authority to, among other things: (1) take possession, custody or control of all Company assets, subject to existing liens, claims and encumbrances; and (2) perform all acts reasonable and necessary to manage, protect and preserve Company assets. Initiation of the litigation and entry of the Order were necessitated by the loss of business, operating losses, diminution in collateral, and the lack of a sufficient likelihood that the Company could obtain alternative financing. Competitive pressure coupled with acute liquidity issues made the continuation of the Company's business unsustainable.

Founded in 1976, the Company has been principally engaged in material handling solutions for a wide range of applications. Historically the Company has provided clients with application analysis, design / equipment recommendations, equipment acquisitions (new and used), equipment rental and leasing options, delivery and installation, project management, and parts and service. The Company has operated out of several leased facilities located in seven states.

The remaining assets of the Company consist primarily of trade accounts receivable, notes receivable, new and used equipment inventory, all of which are pledged to the Company's primary secured creditor. The information taken from the books and records of the Company (without audit or verification) as of the close of business on March 10, 2020 reflect the following:

**Assets[1]**

| | |
|---|---|
| Cash | $     -33,536 |
| Accounts Receivable | 14,110,281[2] |
| Due From Affiliates | 3,185,155[3] |
| Inventory | 2,431,597[4] |
| Machinery & Equipment (net of accumulated depreciation) | 5,479,763[5] |
| Other | 2,727,624[6] |
| | |
| **Total Assets** | 28,123,540 |

---

[1] The Company's assets are subject to a first priority blanket lien and security interests in favor of the Company's secured lender, BMO Harris Bank N.A.

[2] The Receiver sent demand letters and account statements to all account debtors per the Company's 3/25/2020 accounts receivable report. The vast majority of these account debtors have disputed owing any money to the Company and in many cases have claimed to be creditors of the Company. The book value of this asset is considered to be significantly overstated by the Receiver, and collectability is uncertain, at best.

[3] The Receiver is in the process of investigating these claims and will pursue affiliated obligors, if appropriate.

[4] The Receiver has confirmed from his investigation that the new and used inventory appears to be significantly overstated. The Receiver is in the process of locating and identifying all of the new and used inventory for sale.

[5] The estimated recovery on the furniture, fixtures, machinery and equipment is unknown. The Receiver will liquidate these assets through the most expedient means available in order to maximize the recovery to the estate. The Receiver has been unsuccessful in locating assets in this category to support the net book value thereof.

[6] The Receiver is in the process of investigating other Company assets and will pursue applicable parties, if warranted.

**Liabilities**

| | |
|---|---|
| Secured Bank Loans | $9,653,563[7] |
| Accounts Payable | 9,076,180 |
| Accrued Expenses | 1,194,7 |
| **Total Liabilities** | 19,924,505 |

As part of the Receiver's obligations, the Receiver is charged with the responsibility of (1) liquidating the Company's assets in a commercially reasonable manner; and (2) distributing the sale proceeds thereof, less all reasonable costs and expenses incurred to preserve, maintain, and administer the Company's assets, to the creditors of the Company in accordance with the priorities established by law. A potential distribution cannot be determined until liquidation of the assets is completed and all claims submitted by creditors can be reviewed and reconciled with the Company's books and records. After payment of administrative costs incurred in connection with the liquidation and settlement of secured parties and other priority claims, remaining funds, if any, will be distributed according to applicable law.

Please be advised that based upon on the Receiver's preliminary review of the Company's assets and liabilities, it appears more than likely that no meaningful distribution will be made to unsecured creditors. Nevertheless, if a distribution can be made, it would be the desire of the Receiver to provide for a distribution to creditors as soon as reasonably possible. Creditors will be updated on the progress of the Receivership as and when reasonable under the circumstances.

To be considered for a distribution, creditors must execute the enclosed affidavit and return it to the Receiver's noticing and claim agent, BMC GROUP, along with all supporting documentation so that the Receiver can determine the amounts due each creditor as of the date hereof. **Please note, the Receiver has fixed July 31, 2020, as the claim Bar Date, the last date for the timely submission of unsecured and priority claims against the Company** (the "Bar Date"). Your claim must be received on or before the Bar Date for you to participate in the distribution of assets, if any, under the Order, unless the Receiver, in his sole discretion, hereafter otherwise extends the Bar Date in writing.

Should you require further information regarding this matter, please do not hesitate to contact the undersigned.

Very Truly Yours,

Sandor Mark Jacobson, not individually, but as Court Appointed Receiver For KMH Systems, Inc.

cc:     Attorneys for the Receiver:
        Adam Silverman, Esq.
        Alexander Brougham, Esq.
        Adelman & Gettleman, Ltd.
        53 W. Jackson Blvd., Suite 1050
        Chicago, IL 60604
        (312) 435-1050

---

[7] The Company is in default of its obligations pursuant to the terms of the loan documents with the senior secured creditor. The loans are secured with a first priority, blanket security interest in all of the Company's assets. This amount excludes penalties, accrued interest, and fees. The Receiver is continuing its investigation into all liens on Company assets.

RE:     **KMH SYSTEMS, INC.**

    **Illinois, Indiana, Ohio, Michigan, Tennessee, Kentucky, Georgia**

**AFFIDAVIT OF CREDITOR CLAIM**

THE UNDERSIGNED, A CREDITOR OF KMH SYSTEMS, INC., DOES HEREBY FILE ITS CLAIM EXISTING AS OF

MARCH 3, 2020 IN THE AMOUNT OF $_____.

    _____
    NAME OF CREDITOR/COMPANY

    _____
    By: SIGNATURE OF REPRESENTATIVE & TITLE

    _____
    STREET ADDRESS

    _____  _____
             CITY                       STATE      ZIP

    DATED: _____  PHONE: _____

    **CONTACT PERSON NAME**: _____

    **CONTACT PERSON EMAIL**: _____

    **BRIEF DESCRIPTION FOR BASIS OF CLAIM**: _____

_____

_____

_____

_____

**ATTACH STATEMENT OF ACCOUNT OR OTHER SUPPORTING DOCUMENTATION OF THE CLAIM AND MAIL TO:**

| If by Regular Mail: | If by Messenger or Overnight Delivery: |
|---|---|
| BMC Group | BMC Group |
| Attn: **KMH Systems, Inc.** | Attn: **KMH Systems, Inc.** |
| PO Box 90100 | 3732 West 120th Street |
| Los Angeles, CA 90009 | Hawthorne, CA 90250 |

**Or email (with documentation) to: Info@bmcgroup.com**

# Exhibit B to
# Receiver's Initial Report

## Schedule of Cash Receipts and Disbursements

**Sandor Jacobson, Receiver KMH Systems, Inc.**

|  | Mar-20 | Apr-20 | May-20 | Total |
|---|---|---|---|---|
| ***Opening Cash*** | - | 28,816 | 19,552 | - |
| | | | | |
| ***Cash Receipts*** | | | | |
| | | | | |
| AR Collections | 28,816 | 8,442 | 5,165 | 42,423 |
| Secured Creditor Advance | | 58,263 | 97,180 | 155,442 |
| Sale of vehicles | | 9,000 | | 9,000 |
| Funds held at other banks | | | 4,315 | 4,315 |
| | 28,816 | 75,705 | 106,659 | 211,180 |
| | | | | |
| | | | | |
| ***Cash Disbursements*** | | | | |
| | | | | |
| Receiver Fees & Expenses | | (49,671) | (34,843) | (84,514) |
| Receiver Counsel Fees | | (22,901) | (39,426) | (62,327) |
| Other Professional (CFO) | | (2,828) | (2,535) | (5,363) |
| Equipment Appraisal | | (8,591) | | (8,591) |
| Claims Agent BMC | | (910) | (242) | (1,151) |
| Insurance | | | (665) | (665) |
| Account Analysis Fees | | (68) | (74) | (142) |
| ***Total Disbursements*** | - | (84,968) | (77,785) | (162,754) |
| | | | | |
| ***Net Cash Flow*** | 28,816 | (9,263) | 28,874 | 48,426 |
| | | | | |
| ***Ending Cash*** | 28,816 | 19,552 | 48,426 | 48,426 |