UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BMO Harris Bank N.A., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 20-CV-00740 |
| ) | |
| KMH SYSTEMS, INC., ) | |
| ) | |
| Defendant ) | |

**RECEIVER'S SECOND REPORT**

Sandor Jacobson, not individually, but as interim receiver for KMH Systems, Inc. (the "**Receiver**"), appointed pursuant to that certain *Order Appointing Interim Receiver* entered by this Court on March 3, 2020 (ECF No. 17, the "**Order Appointing Receiver**"), hereby submits his second report (the "**Second Report**") to the Court for the period of May 31, 2020 through September 30, 2020 (the "**Period**"), as follows:

**I.   BACKGROUND**

1.   Upon his appointment in March 2020, the Receiver immediately began working to ascertain the assets and liabilities of KMH Systems, Inc. ("**KMH**"). In so doing, the Receiver studied, among other things, the operations of KMH, its debt structure, transfers of assets potentially giving rise to causes of action in favor of the Receiver, KMH's ownership interests in machinery and equipment, and active and inactive litigation involving KMH.

2.   The results of these initial analyses, as well as other initial steps taken by the Receiver, are set forth in the *Receiver's Initial Report* (ECF No. 30, the "**Initial Report**"). In the interest of economy, this Second Report assumes familiarity with the contents of the Initial Report, including the historical business operations of KMH; its financing transactions with BMO Harris

Bank N.A., as KMH's current and primary secured lender ("**BMO**"), Fifth Third Bank, as KMH's prior secured lender, and other purchase money security interest lenders; and the 2018 spinoff of KMH's primary business operations to several newly formed entities under the control of former insiders of KMH, including the spouse of Michael Guenin (KMH's sole owner and president) (the "**Spinoffs**").

3. This Second Report is filed in accordance with Local Rule 66.1(b) and the Order Appointing Receiver, which collectively require the Receiver, every four months, to file a report listing the receipts and disbursements made by the Receiver and the activities of the Receiver during the applicable period. *See* N.D. Ill. L.R. 66.1(b); Order Appointing Receiver ¶ 9, ECF No. 17.

4. The Receiver chose to delay the filing of this Second Report by several days past its technical four-month deadline to give certain parties a chance to rectify the troubling circumstances described in Part II(E) below. The Receiver asks that the Court excuse this delay, given that it was undertaken in the interest of providing the Court with the most accurate and up-to-date summary possible.

II. **SUMMARY OF ACTIVITIES BY THE RECEIVER**

5. This Second Report summarizes the Receiver's primary activities of the Period in five categories: (a) continued investigation and analysis of KMH and potentially recoverable assets; (b) the auction sale of machinery and equipment owned by KMH; (c) pursuit and recovery of the cash surrender value of insurance policies owned by KMH; (d) further evaluation of the ownership and transfer of certain mobile solar generators ("**MSGs**"), and the Receiver's conversation with an agent from the Federal Bureau of Investigation (the "**FBI**") regarding same; and (e) a conflict over Mr. Guenin's obligations to turn over property of KMH to the Receiver.

### A. Continued Investigation and Analysis

6. As discussed in more detail in the Initial Report, KMH's complex and interrelated dealings with the Spinoffs stripped the company of its most valuable assets and left it a husk of its former self. These transactions hinted at the existence of improper conduct by Mr. Guenin and certain insiders and affiliates of KMH, and by the lenders who enabled the transactions to move forward, either willfully or recklessly. To obtain more information—particularly given that KMH's pre-receivership internal recordkeeping was grossly inadequate—the Receiver was required to serve third-party discovery.

7. By the filing of the Initial Report, the Receiver had served nineteen (19) document subpoenas upon individuals and entities believed to have information related to the Spinoffs and other pre-receivership dealings of KMH. Notwithstanding some initial recalcitrance, certain of the subpoenaed parties eventually produced over 15,000 pages of documents, which the Receiver and his counsel have reviewed and analyzed over the course of the Period. In addition to document discovery, the Receiver has continued his factual investigation through numerous phone calls with individuals involved in KMH's pre-receivership activities, as well as financial analysis to make sense of KMH's poor records.

8. The Receiver's investigation and analysis during the Period have resulted in a much better understanding of the causes of action he may be able to pursue on behalf of the receivership estate, as well as the amounts of time, effort, and resources that the receivership estate would need to expend in litigation.

### B. The Auction

9. At the time of the Receiver's appointment, the Spinoffs had already stripped KMH of its most valuable assets. But there remained a need to monetize what were, essentially, the

leftovers: various odds and ends that, due to their age, condition, or lack of utility, had evidently been deemed undesirable for the Spinoffs. For example, many of KMH's remaining lift trucks did not have batteries, forks, or upgraded tires. Upon information and belief, and after consultation with the auctioneer who inspected the Auctioned Assets (as defined below), the leftover assets appear to have been stripped of parts on an as-needed basis and given to the Spinoffs, to the detriment of KMH and its creditors.

10. In the interest of liquidating these assets efficiently, and at the best possible prices, the Receiver filed a motion (ECF No. 32, the "**Sale Procedures Motion**") to conduct a public auction (the "**Auction**") of particular items of KMH's property (collectively, the "**Auctioned Assets**"). Sales at the Auction would be free and clear of all liens, claims, encumbrances, and other interests as defined in the Sale Procedures Motion (collectively, "**Interests**"), with such Interests attaching to the net sale proceeds of the Auctioned Assets. The Sale Procedures Motion also requested: (a) approval of procedures to govern the sale of the Auctioned Assets, (b) permission to employ and compensate Maynards Industries USA LLC (the "**Auctioneer**") as the auctioneer, and (c) such other and further relief as may be necessary to complete the sale of the Auctioned Assets.

11. Both BMO, and also the ownership and management of KMH, consented to the Sale Procedures Motion and entry of the Sale Procedures Order. Accordingly, on July 2, 2020, the Court entered an order granting the Sale Procedures Motion in full (ECF No. 37, the "**Sale Procedures Order**").

12. On July 7, 2020, the Receiver caused a notice of the Auction, substantially in the form attached to the Sale Procedures Order, to be mailed to over nine hundred parties, including

BMO, entities who filed UCC financing statements identifying KMH as a debtor or lessee, all known unsecured creditors of KMH, and the sole shareholder of KMH.

13. Prior to the Auction, two parties timely filed objections to the assets to be sold, and two other parties informally (and with the Receiver's consent) lodged similar objections with the Receiver without filing any written objections with the Court. Without the need for Court intervention, the Receiver resolved all four objections prior to the Auction by withdrawing particular items from the Auctioned Assets.

14. Following many weeks of marketing by the Auctioneer, the Auction was conducted on August 27, 2020. The gross proceeds of the Auction totaled $174,996.00 – a reasonable recovery in light of KMH's prior transfers and the COVID-19 pandemic, but which might have been considerably greater absent these two factors.

15. Shortly after the Auction, in accordance with the Sale Procedures Order, the Receiver filed a motion seeking final confirmation of the Auction's results. The Court held a hearing on September 22, 2020, and the same day granted the Receiver's motion (see ECF No. 52).

    C.    **Liquidation of Insurance Policies**

16. The Receiver's investigations revealed that KMH was the owner and beneficiary of two (2) whole life insurance policies, for which the insured was John Guenin, father to Michael Guenin (the "**Insurance Policies**"). The Receiver assessed his options with respect to the Insurance Policies—including keeping them in force and allowing them to pay out their face values in the indefinite future—but concluded that the receivership estate was best served by surrendering the Insurance Policies and collecting their accumulated cash surrender value.

17. Collecting the proceeds of the Insurance Policies was has been exercise in persistence, given the byzantine strictures imposed by the insurance carriers. But after corresponding with the carriers several times, submitting multiple forms, and spending hours on the phone with customer service representatives, the Receiver and his counsel eventually succeeded in surrendering the Insurance Policies.

18. The Receiver has received the first check for Insurance Policy proceeds, from Northwestern Mutual Life Insurance Company, in the amount of $65,818.10. The second insurance carrier, Transamerica Life Insurance Company, has informed the Receiver that he can expect to receive its check, in the amount of approximately $36,000, in a matter of days.

D. **Mobile Solar Generators and the FBI**

19. As part of his due diligence, the Receiver learned of the bankruptcy case of Double Jump, Inc. pending in the U.S. Bankruptcy Court for the District of Nevada, as Case No. 19-50102, administered jointly with several related cases (collectively, the "**Double Jump Bankruptcy Case**"). The Double Jump Bankruptcy Case is the result of an alleged Ponzi scheme involving the manufacture, sale, and financing of MSGs, which has resulted in several indictments and plea agreements.

20. From a high-level perspective, it appears KMH leased certain MSGs from Solar Eclipse Fund IX ("**Fund IX**") for the purpose of subleasing the MSGs to end-users. It also appears that DC Solar Distribution, Inc., one of the debtors in the Double Jump Bankruptcy Case, "backstopped" KMH's obligations to make lease payments to Fund IX, although KMH's records on this subject are less than complete.

21. The circumstances surrounding the purchase of the MSGs are currently the subject of a criminal investigation by the FBI. While the full details have not yet been made public, it is

believed that Fund IX and others were tricked, in a Ponzi scheme, into purchasing MSGs that did not actually exist. Likely as a result, various businesses now claim ownership of far more MSGs than were, in fact, manufactured or delivered.

22. The Receiver was initially contacted by the financial advisor to the Chapter 7 trustee in the Double Jump Bankruptcy Case (the "**FA**") in late March 2020, soon after his appointment as Receiver. In that initial communication, the FA informed the Receiver that a former employee of KMH had come forward in an ongoing investigation being conducted by the FBI and stated that KMH was in possession over certain MSGs, which were arguably property of the bankruptcy estate in the Double Jump Bankruptcy Case. For months, the Receiver sought to learn whether KMH maintained any rights in the MSGs, as the Receiver had originally hoped to sell them as part of the Auction. During the Receiver's investigation, Mr. Guenin asserted that KMH and certain of the Spinoffs had acquired the MSGs directly from the manufacturer. Mr. Guenin lacked bilateral documentation to support that contention, although the Receiver obtained certain certificates of origin (the "**COOs**") purporting to show that KMH owned the MSGs in question.

23. In an effort to resolve ownership of the MSGs, the Receiver forwarded images of the purported COOs to the FA. After his review, the FA proclaimed that the COOs were fictitious. The FA then coordinated a communication between the Receiver and a representative of the manufacturer of the MSGs to address the COOs. That individual explained to the Receiver that the COOs could not have been accurate, as they were made in an improper format.

24. As a result of his discussions with the FA and a representative of the manufacturer, the Receiver determined that his most prudent course of action was to contact the FBI Agent in charge of the investigation of the matters connected to the Double Jump Bankruptcy Case. The

Receiver wished to go "of record" as to his stewardship over KMH assets and the COOs. As this Court can surely appreciate, the FBI has not apprised the Receiver of its actions or intentions. Further, the Receiver is not aware of any demands from the FA or trustee in the Double Jump Bankruptcy Case as to the MSGs, other than the assertion of the bankruptcy estate's ownership interest therein. Notably, it appears the Spinoffs are in possession of more than one hundred MSGs, while KMH is allegedly in possession of approximately two dozen. The comparative magnitude of possession of these units likely renders the issue more critical to the Spinoffs than it does to the Receiver.

### E. Turnover

25. The pre-receivership operations of KMH were characterized by mismanagement, self-dealing, inaccurate recordkeeping, and deliberate obfuscation. Yet, in the early days of the receivership, it appeared to the Receiver as though Mr. Guenin and his colleagues were willing to move past this conduct and cooperate with the Receiver, as explicitly required by the Order Appointing Receiver. And while there were flashes of cooperation by Mr. Guenin, his later actions have shown that cooperation to have been little more than a ploy. As time passed, Mr. Guenin has dropped his pretense of cooperation bit by bit, revealing with ever-increasing boldness a disregard for the authority of the Receiver—and, by extension, this Court.

26. The latest—though by no means the only—instance of Mr. Guenin's perfidy played out as the Receiver prepared to liquidate the last of KMH's tangible assets: lift trucks procured KMH from Nexen Lift Trucks, Ltd. (the "**Nexen Lift Trucks**"). As set forth in more detail in the *Receiver's Motion for Turnover of Receivership Assets* (ECF No. 49, the "**Turnover Motion**"), before the Receiver was appointed, KMH sold three (3) of the Nexen Lift Trucks to Frick Services, Inc. ("**Frick**"), with the purchase price to be paid in two installments.

27. Frick paid the first installment by a check in the amount of $50,737.27, which, according to KMH's bank statements, was deposited in a KMH bank account. But when the account was closed in March 2020, the money was gone. Mr. Guenin told various stories to the Receiver to explain the whereabouts of the initial installment payment—including that it was being held "in escrow"—and repeatedly assured the Receiver that it would be paid shortly, but never actually produced the funds.

28. Instead of providing the Receiver with the "escrowed" funds, Mr. Guenin appears to have caused a remittance to the Receiver's account on September 18, 2020 in the amount of $31,295.00 from "Alliance Funding Group," whose relation to Mr. Guenin is unknown. The bank transfer documentation contains a reference to another mysterious third party, "Lakeshore Recycling and Disposal." The Receiver is wholly unaware of the provenance of these funds, or the purpose for which the transferor believed it was making the transfer. The Receiver has thus requested an explanation as to the source of these funds and, consistent with other recent dealings, has received no answer from Mr. Guenin.

29. As for the second installment of the Frick payment, Mr. Guenin represented that the second installment was forthcoming, telling the Receiver that it would be paid on September 2, 2020. No check was received that day, or any day thereafter. The Receiver's counsel has made contact with Frick's counsel, and the parties are trying to resolve the matter. Frick is currently asserting entitlement to a "credit memo" allegedly issued to Frick, without the Receiver's knowledge, in September 2020. Unfortunately, because Mr. Guenin failed to communicate a full and complete picture to the Receiver in a timely fashion, the Receiver has had to deploy more resources to decipher this issue than should have been necessary.

30. Separately, Mr. Guenin also interfered with the Receiver's liquidation by refusing to reveal the location of yet another Nexen Lift Truck that remains at large (the "**Missing Nexen Lift Truck**"). Mr. Guenin claimed the Missing Nexen Lift Truck was in the hands of a third-party dealer, who was purportedly holding it until a KMH obligation was paid. But despite numerous demands by the Receiver, Mr. Guenin steadfastly refused to provide the identity or location of the mysterious third-party dealer.

31. After repeatedly seeking to resolve these issues without Court intervention, the Receiver was forced to file the Turnover Motion. The Court granted the Turnover Motion by an order entered on September 24, 2020, requiring Mr. Guenin and his affiliates to turn over both Frick installment payments, and information concerning the whereabouts of the Missing Nexen Lift Truck, to the Receiver immediately. *See Order Granting Motion for Turnover of Receivership Assets*, ECF No. 53 (the "**Turnover Order**"). Upon entry of the Turnover Order, the Receiver's counsel emailed it to Mr. Guenin and KMH's counsel, who expressly accepted service of the Turnover Order via email, as personal service.

32. Since service of the Turnover Order, the Receiver has learned that Mr. Guenin has allegedly sold the Missing Nexen Unit for the amount of $18,000. And, while the $18,000 was remitted to the Receiver's account, no particulars or documentation of the transaction were provided to the Receiver despite his requests for same. Simply providing funds to the Receiver as an alleged payment without more is inconsistent with the Turnover Order. *See* Turnover Order at ¶ 6, ECF No. 53 ("As an alternative to [providing information about the location of the Missing Nexen Unit], *and subject to acceptable documentation*, the Receiver will accept the amount of $18,000 in immediately available United States funds as the purchase price for the Missing Nexen

Unit.") (emphasis added). No documentation whatsoever has been provided in connection with the sale of the Missing Nexen Unit, let alone acceptable documentation.

33. The Receiver is more than disappointed with Mr. Guenin's lack of good faith in, and cooperation with, this receivership proceeding. Despite the Receiver's efforts to be cordial and non-litigious, it now appears highly likely that the Receiver will be required to seek a judgment of indirect contempt against Mr. Guenin, merely in order to secure the assets the Receiver is charged with liquidating.

### III. SUMMARY OF RECEIPTS AND DISBURSEMENTS

34. The Receiver has prepared a schedule of cash receipts and disbursements that have occurred during the receivership, as set forth in **Exhibit A** attached hereto and made a part hereof.

### IV. CONCLUSION

35. As is likely apparent to the Court, this receivership is unique and unconventional, requiring considerable time and effort. The Receiver has endeavored to devote sufficient resources to monetize tangible assets and ascertain the value of intangible assets, while remaining mindful of the rule of diminishing returns and the relatively insignificant recoveries likely to be paid to even the most senior secured creditors of KMH. The Receiver will continue to govern himself accordingly.

Dated: October 13, 2020

Respectfully Submitted,

SANDOR MARK JACOBSON, not individually, but as interim receiver for KMH Systems, Inc.

By: /s/ Adam P. Silverman
      One of his attorneys

**This Receiver's Report Prepared by:**

SANDOR MARK JACOBSON, CPA
PLANTE & MORAN, PLLC
10 South Riverside Plaza, Suite 750
Chicago, IL 60606
Telephone: (312) 928-5387

--and--

ADAM P. SILVERMAN, ESQ. (ARDC #6256676)
ALEXANDER F. BROUGHAM, ESQ. (ARDC #6301515)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd., Suite 1050
Chicago, Illinois 60604
Tel (312) 435-1050
**Counsel for the Receiver**

# Exhibit A to

## *Receiver's Second Report*:

# Schedule of Cash Receipts and Disbursements

**KMH SYTSTEMS**
**Receivership Actuals**

| Month # | Actual 1 | Actual 2 | Actual 3 | Actual 4 | Actual 5 | Actual 6 | Actual 7 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Month | March | April | May | June | July | Aug | Sep | |
| 1  Opening Cash Balance | $ - | $ 28,816 | $ 19,552 | $ 48,426 | $ 48,169 | $ 48,022 | $ 110,516 | $ - |
| 2  Cash Receipts | | | | | | | | |
| 3     AR collections | 28,816 | 8,442 | 2,621 | 497 | 4,598 | 9,803 | 13,476 | 68,254 |
| 4     Life insurance CSV | | | | | | 65,818 | | 65,818 |
| 5     Vehicle sale | | 9,000 | | | | | | 9,000 |
| 6     Huntington Bank close out | | | 6,858 | | | | | 6,858 |
| 7     IRS refund | | | | 4,590 | | | | 4,590 |
| 8     Nexen lift sale proceeds | | | | | | | 35,980 | 35,980 |
| 9     Auction proceeds Maynards | | | | | | | 162,671 | 162,671 |
| 10    BMO funding for administrative expenses | | 58,263 | 97,180 | 68,245 | 60,876 | 49,712 | 62,755 | 397,030 |
| 11    Other misc. receipts | | 9 | | | | | 31,519 | 31,528 |
| 12    Total Cash Receipts | 28,816 | 75,714 | 106,659 | 73,332 | 65,474 | 125,334 | 306,400 | 781,729 |
| 13  Cash Disbursements | | | | | | | | |
| 14    Receiver fees (Plante Moran) | | 49,671 | 34,843 | 26,923 | 29,319 | 22,781 | 30,184 | 193,720 |
| 15    Receiver counsel fees (Adelman & Gettleman) | | 22,910 | 39,426 | 41,323 | 31,557 | 26,932 | 32,571 | 194,719 |
| 16    Insurance (GL) | | | 665 | 137 | 137 | 657 | | 1,596 |
| 17    Noticing agent fees (BMC Group) | | 910 | 242 | 4,232 | 1,488 | 11,885 | | 18,757 |
| 18    Precision Accounting (BR by the hour) | | 2,828 | 2,535 | 975 | 3,120 | 585 | 488 | 10,530 |
| 19    Bank fees | | 68 | 74 | | | | | 142 |
| 20    Maynards Equipment Appraisal | | 8,591 | | | | | | 8,591 |
| 21    Miscellaneous | | | | | | | | - |
| 22    Total Cash Disbursements | - | 84,977 | 77,785 | 73,589 | 65,621 | 62,839 | 63,242 | 428,055 |
| 23  Ending Cash Balance | $ 28,816 | $ 19,552 | $ 48,426 | $ 48,169 | $ 48,022 | $ 110,516 | $ 353,674 | 353,674 |